IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>ELVIS EGHOSA OGIEKPOLOR | Criminal Action No.<br><br>1:21-cr-16-WMR |

**Government's Response to Defendant's Motion for New Trial**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Alex R. Sistla, Assistant United States Attorney for the Northern District of Georgia, files this response to Defendant Elvis Ogiekpolor's *pro se* Motion for Judgment of Acquittal (R. 102, "Rule 29 Mot."). For the reasons below, the Court should deny his motion.

## Background

On May 31, 2021, after an eight-day trial, a jury convicted Ogiekpolor of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and fifteen counts of substantive money laundering, in violation of 18 U.S.C. § 1957. (R. 98, Jury Verdict.) At trial, the government presented overwhelming evidence that beginning in at least February 2019 and continuing until August 2020, Ogiekpolor conspired with multiple individuals to open fraudulent business bank accounts in the names of sham businesses for the purpose of laundering

millions of dollars in fraud proceeds.[1] The government presented the testimony of six individuals Ogiekpolor used to open nearly four dozen business bank accounts in the names of the sham businesses. Among these six individuals, five pleaded guilty to conspiracy to commit money laundering, while one received letter immunity because she had cooperated with the government while its investigation was still covert.[2] The testimony of these co-conspirators was corroborated by bank records, Georgia Secretary of State records, and WhatsApp communications (both messages and recordings) between each of these cooperating defendants and Ogiekpolor.

Each cooperating defendant—none of whom knew the other except two sisters—testified that Ogiekpolor had them register a company with the State of Georgia and then proceed to open multiple business bank accounts in the names of those companies. They explained that Ogiekpolor paid for the business registration and told them that their companies would be involved in some sort of logistics business, such as

---

[1] Ogiekpolor did not request any trial transcripts prior to filing his motion. The government therefore only briefly recounts the evidence form trial, rather than provide a detailed recitation. In any event, the government believes that the Court is very familiar with the facts of this matter having presided over this relatively recent trial, as well as the guilty pleas of five cooperating defendants. If the Court requires more detailed citations to the record, the government respectfully requests permission to supplement this filing once trial transcripts have been prepared.

[2] The five cooperating defendants who have pleaded guilty are Kutina Crawford, Tamara Gaines, Tiffany Gaines, Ebony Parks, and Vere Whyte. A sixth cooperator, Sabrina Graham, received letter immunity.

moving furniture or medical supplies. The evidence showed, however, that none of these entities ever engaged in any legitimate business activity. A fact that was confirmed through the bank records showing no legitimate business expenses, as well as the fact that dozens of bank accounts were open and repeatedly closed (typically for suspicious activity or suspected fraud) in the names of these businesses.[3] The messages retrieved from Ogiekpolor's phone and those of several of the cooperating defendants further corroborated their testimony. In the dozens of WhatsApp and text messages presented to the jury, Ogiekpolor was clearly managing and directing the cooperating defendants—the co-conspirators—as to what to do with respect to the fraudulent business bank accounts. He is directing them to open more accounts, to check on the status of various incoming wires or deposits, and to execute various transactions, including wiring or withdrawing large sums of money out of the accounts. (GX-101, GX-104, GX-105, GX-107, GX-109, GX-111).[4] Ogiekpolor would also advise them when

---

[3] Through an FBI forensic accountant, the government presented two summary charts detailing the approximately $9 million that went through the 44 fraudulent business bank accounts that Ogiekpolor caused to be open. (GX-124, GX-125). Government's Exhibit 124 in particular summarized how much money went into and out of each of the accounts, how they were funded, and when they were opened and closed. This exhibit plainly illustrated that the accounts were typically open for only a short period of time, further

[4] These exhibits contain multiple sub-exhibits, each of which is a separate WhatsApp message exchanges between Ogiekpolor and the respective cooperating individual.

3

fraud proceeds were expected to hit the accounts, not infrequently sending them screenshots of the wiring instructions if a bank might wish to confirm the apparent legitimacy of the transaction. In this respect, several of the cooperating defendants also testified that they would inform Ogiekpolor when an account was frozen or being closed because of suspected fraud and on multiple occasions he would be on calls with the bank when they learned this information. The cooperating defendants also uniformly testified that they knew—perhaps not immediately—but soon after opening the bank accounts and conducting financial transactions at Ogiekpolor direction that neither they nor Ogiekpolor were entitled to the funds going into these accounts—and that the funds were the proceeds from some sort of fraudulent activity. Several of the cooperating defendants also testified that they provided Ogiekpolor with their addresses where they would receive checks, large amounts cash, and other items, such as credit or debit cards, in the mail or via FedEx that were neither addressed to them or Ogiekpolor. There was direct and circumstantial evidence that these checks and cash were the proceeds of various frauds. Ogiekpolor would typically pick-up the cash and checks after they arrive and have one of the co-conspirators deposit them in one of the accounts.

 In addition to the WhatsApp exchanges between Ogiekpolor and the cooperating defendants, the government also presented dozens of exchanges between him and multiple unindicted co-conspirators

documenting that he sent the fraudulently opened business bank accounts to others for the purpose of receiving fraud proceeds. Ogiekpolor also received and exchanged multiple communications with these unindicted co-conspirators regarding financial transactions (or mailings) involving several of the victims who testified at trial, as well as expressing concerns about law enforcement (GX 114-6, GX 115-39), and letting his compatriots know things were "hot" in Atlanta and to lay low after the FBI made public the takedown of a similar money laundering scheme (the "Five Fingers" case) (*e.g.,* GX 113-5, GX-113-11, GX 113-12). The jury in fact saw several exchanges in which Ogiekpolor described exactly the criminal conduct he was involved in; namely, how he used bank accounts to engage in money laundering (GX 108-4, 108-5), even describing it as "money laundry" and warning not to "push" (*i.e.*, send) less than $70,000 because sending too little too often will cause the banks to close the accounts. (GX 116-69).

The government also presented testimony from nearly two dozen victims to establish the funds going into the accounts that Ogiekpolor controlled were the proceeds of various fraudulent scheme. Multiple witnesses testified to being victims of romance frauds, while others testified that their employers (or former employers) were the victims of business email compromise schemes or other online frauds. Ogiekpolor did not dispute that these witnesses had been defrauded. Nor did he

dispute that the funds had been wired or deposited into the bank accounts opened by co-conspirators.

In closing arguments, Ogiekpolor emphasized that none of the victims knew who he was and there was no evidence linking him to the underlying frauds. He also argued that he did not know the funds being wired or deposited into the accounts were the proceeds of some criminal activity. Rather, he claimed to have acted in good faith and truly believed that these funds were related to his allegedly legitimate business activities, including the purchasing of used cars at auctions. The jury rejected his arguments, and after a few hours of deliberation convicted him on all sixteen counts.

On June 15, 2022, Ogiekpolor filed a motion for judgment of acquittal. (R. 102, Rule 29 Mot.) He argues: (i) there was insufficient evidence from which the jury could convict him of conspiracy to commit money laundering and the substantive money laundering counts because the evidence allegedly did not show that he had entered into an unlawful agreement or knew the funds in the accounts were the proceeds of some specified unlawful activity (*id.* at 4-12, 19); (ii) he was prejudiced by receiving certain discovery late, by certain statements in closing argument, and by the admission of various pieces of evidence at trial (*id.* at 12-14); and (iii) his Sixth Amendment confrontation rights were violated. (*Id.* at 15–16.) The government now files its response in opposition.

## Argument

### A. There was overwhelming from which the jury could convict Ogiekpolor of conspiracy to commit money laundering and substantive money laundering.

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "is a direct challenge to the sufficiency of the evidence presented against the defendant." *United States v. Aibejeris*, 28 F.3d 97, 98 (11th Cir. 1994). "In considering a motion for the entry of judgment of acquittal under [Rule 29(c)], a district court should apply the same standard used in reviewing the sufficiency of the evidence to sustain a conviction." *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999). In doing so, the Court "must: (1) view the evidence in the light most favorable to the government; (2) resolve any conflicts in favor of the government; (3) accept all reasonable inferences that tend to support the government's case; and (4) assume that the jury made all credibility choices in support of the verdict." *United States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir. 2012) (citing *United States v. Williams*, 527 F.3d 1235, 1244 (11th Cir. 2008)). A jury verdict should not be disturbed "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013) (citation omitted). The "evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the

7

evidence presented at trial." *United States v. Hernandez*, 896 F.2d 513, 517 (11th Cir. 1990). "In rebutting the government's evidence 'it is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.'" *Williams*, 527 F.3d at 1244 (quoting *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006) (alteration omitted)).

To establish the existence of a money laundering conspiracy, the government was required to prove beyond a reasonable doubt "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *United States v. Moran*, 778 F.3d 942, 962 (11th Cir. 2015) (quoting *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012)).[5] The government did not have to prove an overt act in furtherance of the conspiracy. *Whitfield v. United States*, 543 U.S. 209, 214 (2005). Nor was it required to show evidence of willfulness or

---

[5] At trial, the jury was instructed as follows: [t]he Defendant can be found guilty of conspiracy to commit money laundering under Title 18, United States Code, Section 1956(h), only if all the following facts are provided beyond a reasonable doubt: (1)   two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. Section 1957; and (2) the Defendant knew about the plan's unlawful purpose and voluntarily joined in it.

8

specific intent. *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007).

Ogiekpolor argues that the government "failed to show any form of agreement whatsoever between [himself] and the so called 'co-conspirators.'" (R. 102, Rule 29 Mot. at 4.) He appears to suggest that they could not have an agreement to commit money laundering because supposedly neither he nor the co-conspirators knew that the funds being wired or deposited into the fraudulently opened business bank accounts were the proceeds of any unlawful activity. His is wrong.

The government did not have provide evidence of a "formal agreement" to satisfy the first element of a money laundering conspiracy. Rather, the government needed only to "demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1182 (11th Cir. 2006). Evidence that the defendant "committed an act which furthered the purpose of the conspiracy is an example of the type of circumstantial evidence the government may introduce to prove the existence of agreement." *Id*. The government was also not required to prove that a conspiracy participant knew all details of the conspiracy or participated in its every aspect. *United States v. Arbane*, 446 F.3d 1223, 1229 (11th Cir. 2006) (citation omitted). Rather, the government need only prove that the defendant knew "the essential nature of the conspiracy." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir.

9

2013). "In the case of a conspiracy to launder money, the 'essential aspect of the conspiracy charge' is that the *defendant* 'knew that the funds involved in the transactions represented the proceeds of unlawful activity.'" *United States v. Molina*, 413 F. App'x 210, 212 (11th Cir. 2011) (quoting *United States v. Awan*, 966 F.2d 1415, 1434 (11th Cir. 1992)) (emphasis added).

Viewing the evidence in the light most favorable to the government, the government readily met its burden at trial with respect to establishing the elements of the money laundering conspiracy. Six cooperating individuals—five who pleaded guilty to conspiracy to commit money laundering—uniformly testified that they opened fraudulent business bank accounts and conducted financial transactions into those accounts at Ogiekpolor's direction. They also testified that they informed Ogiekpolor when the banks suspended or closed their accounts for suspicious activity or fraud and that Ogiekpolor would push them to open more bank accounts. Their testimony was corroborated by dozens of WhatsApp communications and text messages. The evidence showed the Ogiekpolor and the co-conspirators "knew the conspiracy's essential nature"—to open multiple fraudulent business bank accounts in the names of sham businesses for the purpose of receiving the proceeds of various fraud and then launder those funds through large cash withdrawals, the purchase of cashier's checks, and outgoing wires. Because the evidence showed that neither

Ogiekpolor nor any of the cooperating co-conspirators were operating any legitimate businesses, they knew—and in fact testified to this fact—that they were not entitled to the *hundreds of thousands of dollars* that flowed through each of these accounts (and *millions* in total). Indeed, there was no evidence that any of these businesses or bank accounts were tied to any legitimate activity. And it makes no sense—as Ogiekpolor argued at trial and again in his motion—that somehow, he had a good faith belief that these funds were related to his *own* legitimate business activities where not a single account was opened in his name or the name of his business. This is especially so where the banks are repeatedly closing the accounts, reversing wires, or freezing funds. No individual engaged in a legitimate business would act so indifferently to these events.

The government further showed the Ogiekpolor knew the funds going into the bank accounts were fraud proceeds through the dozens of WhatsApp messages in which unindicted co-conspirators requested bank accounts from Ogiekpolor for "dating" or checked whether the accounts were still "good." Lastly, Ogiekpolor's own words confirmed that he knew that the bank accounts were being used to receive and launder fraud proceeds. As noted above, he explained in detail how his criminal scheme worked and even describing it as "money laundry."

With respect to the substantive § 1957 counts, the government had to prove beyond a reasonable doubt: (1) that the defendant knowingly

11

engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000, and (2) that the property was derived from specified unlawful activity. *United States v. Hernandez*, 490 F. App'x 250, 252 (11th Cir. 2012) (citing *United States v. Silvestri*, 409 F.3d 1311, 1332-33 (11th Cir. 2005)). The government did not have to prove that Ogiekpolor knew that the property was derived from "specified unlawful activity" alleged in the indictment; it only needs to prove that the defendant knew that the property was criminally derived. *Id.* (citing *United States v. Baker*, 19 F.3d 605, 614 (11th Cir. 1994)).

Ogiekpolor challenges his § 1957 convictions on the basis that the government failed to show he had the requisite knowledge and that there was no evidence he performed the transactions underlying the substantive counts. His argument that the government lacked sufficient evidence to show he knew that the funds going into the accounts were proceeds of some specified unlawful activity, it fails for the reasons above. The government also did not have to show that Ogiekpolor personally conducted the transactions underlying Counts 2 through 16 and Count 17. Rather, the evidence at trial showed that Ogiekpolor directed the cooperating co-conspirators to execute these transactions. The government presented WhatsApp messages between Ogiekpolor and several of the cooperating co-conspirators in which Ogiekpolor is directing them to execute a particular transaction

12

charged in the indictment. Moreover, each of the cooperating co-conspirators testified to performing the transactions at Ogiekpolor's direction. The jury therefore could have convicted Ogiekpolor on an aiding and abetting theory of liability.

### B. Whether considered independently or together, Ogiekpolor was not prejudiced by any late discovery, evidence introduced at trial, or statements by the government in closing argument.

"'The sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction.'" *United States v. Miranda*, 425 F.3d 953, 962 (11th Cir. 2005) (quoting *United States v. Fozo*, 904 F.2d 1166, 1171 (7th Cir. 1990)). Accordingly, the Court may not entertain, under Rule 29, Ogiekpolor's arguments that he's entitled to judgment of acquittal based on alleged prejudice from certain events at trial or a supposed violation of his confrontation clause rights. Because Ogiekpolor is proceeding *pro se*, however, the government respectfully requests that the Court construe his motion on these non-sufficiency grounds as a motion for a new trial under Federal Rule of Criminal Procedure 33(a).

Rule 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Although "motions for a new trial are disfavored," *United States v. Williams*, 146 F. App'x 425, 434 (11th Cir. 2005), the "interest of justice" standard is broad, and the trial court is vested with

13

substantial discretion in determining whether to grant such a motion. *See, e.g.*, *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994) (holding that "interest of justice" standard is broad and "not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous").

Ogiekpolor claims he was prejudiced at trial because of: (i) late produced discovery; (ii) the admissions of various pieces of evidence at trial, including a reference to the Five Fingers investigation; and (iii) by certain statements in the government's closing argument. None of these grounds—taken individually or collectively—warrant granting Ogiekpolor a new trial.

*First*, Ogiekpolor does not specifically identify what materials he received late that prejudiced him. The primary discovery (exhibits) the government provided at the time of trial (or after the jury was selected) was additional bank records that the government advised it was waiting to receive from several financial institutions. Ogiekpolor does not explain how he was prejudiced by receiving these records for a couple accounts at or during trial. Accordingly, this is not a basis upon which to grant him a new trial.

*Second*, Ogiekpolor complains that he was prejudiced by the introduction of evidence relating to the Five Fingers investigation and because the government allegedly "selectively edited" the WhatsApp (or text) messages it showed the jury. With respect to the latter claim, he's

14

plainly wrong. Ogiekpolor raised this contention at trial, and the Court asked him to identify *any* instances in which the government had selectively edited or presented the WhatsApp or text messages in a fashion that mischaracterized his statements or the context of the exchanges. Ogiekpolor did not identify any such instances. He was also free to try to introduce WhatsApp and text messages that he believed would "complete" the story from his point of view. He failed to do that as well.[6] As for his complaint about the messages relating to the Five Fingers investigation, he does not explain how he was prejudiced. The government introduced the evidence as circumstantial evidence of his knowledge relating to improper and illegal use of bank accounts to launder fraud proceeds. The government did not argue that he was linked in any fashion to the Five Fingers investigation. Nor did it argue that his reaction to that investigation—standing alone—established his guilt.

*Third*, the prosecutor's statements in closing and rebuttal do not warrant a new trial.[7] In rebuttal, the government stated something to

---

[6] The undersigned does recall, however, that Ogiekpolor did introduce some messages without objection from the government. To the extent he did, they did undermine the government's evidence.

[7] To establish prosecutorial misconduct, "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *See United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different. *United States v. Wilson*, 149 F.3d 1298, 1301

the effect "the jury should disregard Ogiekpolor's comments." This was not improper. The government was responding to Ogiekpolor's argument that there was no evidence he was involved in the underlying fraud. The government correctly pointed out that in order for the jury to convict him of conspiracy to commit money laundering and substantive money laundering, it was not required to show that he perpetrated any of the underlying frauds, only that he knew that the funds being wired or deposited into the fraudulent opened business bank accounts were proceeds of some specified unlawful activity. Nor did the government err by characterizing the bank accounts had all been closed for fraud or other suspicious activity. The testimony from the cooperating co-conspirators, as well as select bank employees, confirmed that the accounts had been closed for those reasons. Even if the government overstated in its closing that all the accounts were closed for fraud—rather than perhaps more precisely stating that "most" or "virtually all" of the accounts were closed for that reason— this type of mistake would not warrant a new trial given the overwhelming evidence of Ogiekpolor's guilt.[8]

---

(11th Cir.1998). When the record contains sufficient independent evidence of guilt, any error is harmless. *United States v. Adams*, 74 F.3d 1093, 1097-98 (11th Cir.1996).

[8] Ogiekpolor also claims that the government told the jury that it could convict "if some money that came in the account were from unlawful activity." (Doc. 102, Rule 29 Mot. at 14). He suggests this was error by the government. It is unclear, however, to which portion and in which context

**C. Ogiekpolor's Sixth Amendment rights were not violated.**

Lastly, Ogiekpolor argues that his Sixth Amendment confrontation rights were violated under *Bruton v. United States*, 391 U.S. 123 (1968). (R. 102, Rule 29 Mot. at 15-16). Ogiekpolor is wrong because none of the evidence introduced at trial implicates *Bruton*.

"*Bruton* held that the introduction at trial of statements made by a non-testifying co-defendant violates a defendant's Sixth Amendment right to confront the witnesses against him if the statements "facially incriminate" the defendant." *United States v. Weadick*, 15 F.4th 1, 12 (1st Cir. 2021) (citing *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010)). But not every statement implicates *Bruton*— only "testimonial" ones implicate the Sixth Amendment. *Davis v. Washington,* 547 U.S. 813, 821 (2006). "And the Supreme Court has explained that 'statements in furtherance of a conspiracy' are 'by their nature . . . not testimonial.'" *Weadick*, 15 F.4th at 12 (quoting *Crawford v. Washington*, 541 U.S. 36, 56 (2004)). *Bruton* therefore "does not bar the use of a co-conspirator statement made in furtherance of the

---

of the closing argument he's referring. The government *did have to show* that the funds going into the accounts were the proceeds of some mail or wire fraud. If he's suggesting that the government implied to the jury that it did not have to find that Ogiekpolor knew that the funds were the proceeds of some specified unlawful activity, he's plainly wrong. The government's closing and rebuttal arguments were focused on showing how the evidence proved beyond a reasonable doubt that he had the requisite knowledge.

17

conspiracy and admissible under a traditional hearsay exception." *United States v. De La Paz-Rentas*, 613 F.3d 18, 29 (1st Cir. 2010); *see also, e.g.*, *United States v. Cruz*, 508 F. App'x 890, 899 (11th Cir. 2013).

Ogiekpolor does not identify which statements he believes raise a *Bruton* problem, but assuming he's referring to the WhatsApp exchanges between the himself and the unindicted co-conspirators, their statements did not implicate *Bruton* for three reasons: (i) those statements were admissible as co-conspirator statements made in furtherance of the conspiracy; (ii) even if some of those WhatsApp messages were not substantively admissible under the co-conspirator exception, they would nevertheless be admissible for the non-hearsay purpose to show the effect on the listener (or in this case recipient); and (iii) none of the statements "facially incriminate" Ogiekpolor.

\* \* \* \* \*

## Conclusion

For the foregoing reasons, the Court should deny Ogiekpolor's motion.

Respectfully submitted,

RYAN K. BUCHANAN
    *United States Attorney*

/s/ ALEX SISTLA
    *Assistant United States Attorney*
    Georgia Bar No. 845602
    Alex.Sistla@usdoj.gov

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and standby counsel of record, and by mailing a copy of this filing via certified mail to *pro se* defendant Elvis Ogiekpolor at the following address:

   Elvis Eghosa Ogiekpolor
   05818-509
   Robert A. Deyton Detention Facility
   11866 Hastings Bridge Road
   PO Box 429
   Lovejoy, GA 30250

August 8, 2022

/s/ ALEX SISTLA

ALEX SISTA

*Assistant United States Attorney*